J-A20013-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: W.U., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.U., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 934 EDA 2024 |

Appeal from the Order Entered March 8, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000186-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: W.U.,JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.U., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 935 EDA 2024 |

Appeal from the Decree Entered March 8, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000381-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: V.U., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.U., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 936 EDA 2024 |

Appeal from the Order Entered March 8, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000187-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: V.U., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |

APPEAL OF: S.U., MOTHER

: No. 937 EDA 2024

Appeal from the Decree Entered March 8, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000382-2023

IN THE INTEREST OF: B.U., A MINOR

APPEAL OF: S.U., MOTHER

: IN THE SUPERIOR COURT OF
: PENNSYLVANIA

: No. 938 EDA 2024

Appeal from the Order Entered March 8, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000188-2022

IN THE INTEREST OF: B.U. A MINOR,

APPEAL OF: S.U., MOTHER

: IN THE SUPERIOR COURT OF
: PENNSYLVANIA

: No. 939 EDA 2024

Appeal from the Decree Entered March 8, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000383-2023

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and LANE, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED SEPTEMBER 27, 2024**

S.U. (Mother) appeals from the orders and decrees, entered in the Court

of Common Pleas of Philadelphia County, changing the permanency goal from

reunification to adoption and involuntarily terminating her rights to her three minor children, W.U., Jr. (born 4/11), V.U. (born 7/13), and B.U. (born 10/16) (collectively, Children).[1]  After careful consideration, we affirm.

In February 2022, the Philadelphia Department of Human Services (DHS) received a general protective services (GPS) report that Mother had been abusing illegal substances and was homeless.  The report was deemed valid.  DHS learned that Children were residing with Mother in Maternal Grandmother's home.  Mother admitted that she had recently been evicted from her home and that she was actively using methamphetamines.  Maternal Grandfather[2] agreed to sign a safety plan and have Children and Mother move into his home.  DHS provided in-home services for the family that were implemented through the Community Umbrella Agency (CUA).  In late-February, Mother informed DHS that she had admitted herself into an inpatient drug and alcohol treatment program.  However, only two weeks into treatment, Mother signed herself out of the inpatient facility, threatening to violate CUA's safety plan and remove Children from Grandfather's home.

_____

[1] On April 10, 2024, our Court *sua sponte* consolidated Children's separate appeals at Nos. 934-939 EDA 2024, as they involve related parties and issues. **See** Pa.R.A.P. 513.

[2] Maternal Grandmother told a DHS social worker that she was sick with Stage 4 cancer and could not care for Children.  **See** N.T. Goal Change/Termination Hearing, 3/8/24, at 22.  At that point, the social worker called Maternal Grandfather, who agreed to have Mother and Children move in with him.  **Id.** at 22-23.

On March 1, 2022, DHS obtained an order of protective custody (OPC) for Children; Children remained in Grandfather's care.[3]  On March 4, 2022, a shelter care hearing was held, after which the court lifted the OPC order and prohibited Mother from contacting and visiting Children.  The court held a permanency hearing on March 23, 2022, and ordered supervised, weekly visitation between Mother and W.U., Jr., at DHS.

On April 11, 2022, the following single case plan was developed for Mother:  (1) comply with CUA case management[4] and court-ordered services; (2) sign all consent and release forms; (3) obtain suitable housing; (4) address her substance abuse issues; (5) participate in a Clinical Evaluation Unit (CEU) assessment and submit to court-ordered urine drug screens; (6) submit to three court-ordered random urine drug screens; (7) attend a Behavioral Health Forensic Evaluation Center consultation and evaluation; (8) address visitation; and (9) attend supervised visits at DHS within line of sight and line of hearing.

Children were adjudicated dependent on April 18, 2022.  Legal custody of Children was transferred to the DHS.  Children were placed in kinship care with Grandfather.  In June of 2022, Children were moved to the kinship care home of Paternal Aunt (Aunt) and Paternal Uncle.  Children were referred for

---

[3] W.U., Jr., and V.U. were also found to have severe truancy issues at the time of DHS' investigation.

[4] CUA's case plan objectives for Mother included obtaining household management skills, getting suitable housing, addressing mental health issues, and managing substance abuse issues.  *See* N.T. Goal Change/Termination Hearing, 3/8/24, at 29-30.

trauma-focused therapy, provided by clinicians at Children's Crisis Treatment Center (CCTC), to address their exposure to Mother's mental health issues, which included hallucinations, delusions, mania, and depression. *See* N.T. Goal Change/Termination Hearing, 1/18/24, at 64; CCTC Treatment Letter, 10/2/23, at 1-2. In particular, V.U.'s therapist noted that V.U. suffered from inconsolable crying, had sleep issues, worried, had fears and intrusive thoughts, and was generally sad. *Id.* at 88. Since receiving therapy, V.U.'s therapist said that her sleep issues have improved, but that she still exhibits "a lot of sadness." *Id.* at 89.

B.U.'s therapist, Amatullah Abu Bakr, testified she had only been working with B.U. for a little less than one month at the time of the termination hearing; B.U.'s prior therapist, Emma Lewi, left the agency in November 2023. *Id.* at 105. Abu Bakr testified that B.U. suffered from PTSD, that he currently seems to be "in a safe and secure placement," and was not currently exhibiting any symptoms. *Id.* at 106-08.

Children's therapists collectively recommended that Children continue to participate in weekly, in-person trauma-focused therapy, *id.* at 68, live with a caregiver who can provide them a stable and safe environment, *id.* at 69, and pause visitation with Mother due to Mother having missed visitation for an extended period of time. *Id.* at 71. W.U.'s therapist testified that pausing visitation would "support the [C]hildren with their treatment by reducing opportunities for being triggered, or trauma reminders, as well as allowing [Mother] more time to focus on her treatment needs and stability before

engaging in caregiving work" in order to achieve reunification. *Id.* In fact, CUA case manager Spencer Vaye testified that at visits Mother had told Children that she was "going to take them home . . . and [they would] come live with [her]." *Id.*, 3/8/24, at 35. Mother missed nine visits with Children, *id.* at 37, and was late for seven visits. *Id.*

At a September 2023 inter-agency remote meeting, the CCTC therapists did not deem caregiver sessions for Mother clinically appropriate, even though Mother had reached out to begin caregiver sessions, because it had been reported that Mother had missed 11 to 12 supervised visits between June and August of 2023 for an at-the-time unknown reason. *Id.*, 1/18/24, at 79-80. However, CCTC clinician Cheyenne DuFall testified that during the Zoom meeting in September, she learned that Mother had missed the visits because she was in an inpatient treatment program. *Id.* at 80-81. Despite Mother having reached out to commence the sessions, DuFall testified that without proof that Mother had successfully completed a drug and alcohol program, CCTC would not have recommended she begin caregiver sessions. *Id.* at 82-83. At the time of the termination hearing, Mother's supervised visits with Children had resumed and were occurring once a week for two hours at the agency. *Id.* at 112. *See also id.* at 113 (DHS attorney stating agency not asking to change Mother's scheduled visitation).

In April and October of 2022, Mother's urine sample, collected and tested thought the Substance Analysis Unit/CEU, came back positive for amphetamines. *See* N.T. Goal Change/Termination Hearing, 1/18/24, at 34,

37. In April 2023, Mother gave birth to a child; both Mother and the infant tested positive for benzodiazepines and amphetamines. *Id.* at 44. Mother admitted to a DHS intake social worker that she had been taking amphetamines and benzodiazepines throughout that pregnancy. *Id.* at 45.

On January 18, 2024, the court held a goal change and contested termination hearing where CEU/Substance Analysis Unit Clerk Scott Signell, DHS Social Worker Nadine Fulton, CCTC Trauma Clinicians Diamond Harper (for V.U.), DuFall (for W.U.) and Amatullah Abu Bakr (for B.U.), and CUA case manager Vaye testified. Vaye testified that Children are doing very well and thriving in their placement with their kinship caregiver, paternal aunt and uncle. *Id.* at 56. Moreover, V.U.'s therapist testified that Aunt participates in V.U.'s therapy, providing V.U. support and acting as the "anchor for [V.U.] in those moments" where V.U. has a "lot of confusion and sadness around inconsistency in the past with [Mother's] visits as well as [her] worries for the future." *Id.* at 92. *See also id.* at 100 (V.U.'s therapist testifying V.U. exhibited "deregulation" around Mother's missed visits resulting in trauma symptoms increasing). V.U.'s therapist testified that over the past year of therapy, V.U. "is a completely different kid" socially, now participating in school plays, going on sleepovers, making friends, expressing feelings, and becoming involved in sports. *Id.* at 96.

On March 8, 2024, W.U. testified that he would like to be adopted by Aunt, who has provided him stability and nurtured him, and that while he would feel sad if he did not see Mother anymore, he "would be fine with it."

N.T. Goal Change/Termination Hearing,[5] 3/8/24, at 8-13.[6]  An October 2023 CCTC letter, prepared by CCTC trauma therapists, noted that after 23 trauma therapy sessions, "[a]s visitation with [Mother] has been reintroduced, [W.U.'s] trauma-related symptoms have increased, . . . including [W.U.] engaging in physical aggression with peers and having increased difficulty concentrating."  CCTC Treatment Letter, 10/2/23, at 3.

At that same proceeding, V.U. testified that her visits with Mother are "good," that he likes visiting with Mother, and that if he could be reunified with Mother, he would like to live with Mother over Aunt.  N.T. Goal Change/Termination Hearing, 3/8/24, at 20.  V.U. also testified that she understands what adoption means and that while Aunt provides for her security and she is happy living with Aunt, she would be "sad" if she were not able to see Mother.  *Id.* at 23.  Finally, V.U. testified that she gets worried and upset when Mother does not show up to visits, *id.* at 25, that she would be happy to stay with Aunt if she could not be reunited with Mother, but that even if W.U. and B.U. continued to live with Aunt, she would still want to live

_____

[5] Children were represented by both a guardian *ad litem* and separate counsel at the goal change/termination hearings.  **See** 23 Pa.C.S.A. § 2313(a); **see also In re Adoption of L.B.M.**, 161 A.3d 172 (Pa. 2017) (where court finds guardian *ad litem* cannot adequately represent legal interests of child, counsel must be appointed).

[6] W.U. also testified that if he had the option of living with his aunt and uncle, but continue to see Mother, that would be preferred over adoption.  **See id.** at 13-14.  However, later, when the court further explained to W.U. what adoption meant, he testified that he would still want to be adopted.  **Id.** at 15-16.

with Mother if possible. *Id.* at 27. *See also* CCTC Treatment Letter, 10/2/23, at 4 (V.U. began experiencing sadness and sleep issues when visits with Mother resumed).

Finally, B.U. testified that she likes living with Aunt, that her visits with Mother are "good," that she would like to spend more time with Mother, and that she would like to go back with Mother rather than be adopted. N.T. Goal Change/Termination Hearing, 3/8/24, at 28-30. However, B.U. also testified that if it were not possible to be reunited with Mother, she would feel "good" about living with Aunt. *Id.* at 30. CCTC therapists noted that even after 24 trauma-therapy sessions, B.U. experiences an increase in bedwetting incidents and nightmares before and after his expected visits with Mother. *See* CCTC Treatment Letter, 10/2/23, at 5-6.

At the conclusion of the termination proceedings, counsel for Children asked the court to deny the petitions as to B.U. and V.U., but grant the petition as it related to W.U. *See* N.T. Goal Change/Termination Hearing, 3/8/24, at 130. Counsel stated that the two younger children "clearly stated that they would like the opportunity to go back with [M]other if the circumstances did, in fact, change [and] that that is a clear sign that these [two] children . . . do not want to be adopted." *Id.* at 132. DHS's attorney, on the other hand, argued that it would be in Children's best interest to have the goal changed to adoption and Mother's rights terminated where CUA case manager Vaye testified that Children would not suffer irreparable harm if Mother's rights were terminated and where Children are thriving in their current kinship placement,

a pre-adoptive home that has provided Children stability and fulfilled their emotional, developmental, and behavioral needs. *Id.* at 127-28.

On March 8, 2024, the court changed the permanency goal to adoption and involuntarily terminated Mother's rights to Children pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b) of the Adoption Act.[7]  Mother filed a timely notice of appeal and contemporaneous Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.  *See* Pa.R.A.P. 1925(a)(2)(i). On appeal, Mother presents the following issues for our consideration:

> Did the trial court err as a matter of law and abuse its discretion by involuntarily terminating [Children's] parental rights under 23 Pa.[]C.S.[A.] § 2511(b), where [DHS] failed to prove by clear and convincing evidence that involuntarily terminating [Children's] parental rights would best serve the emotional needs and welfare of the Children?
>
> Did the trial court err as a matter of law and abuse its discretion by changing the Children's permanency goal from reunification to adoption where [DHS] failed to provide sufficient evidence that such a goal change would be best suited for the [C]hildren's needs and welfare[?]

Mother's Brief, at 4.

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.  The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."  It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

---

[7] 23 Pa.C.S.A. §§ 2101-2938.

- 10 -

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation and quotation marks omitted). We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.*

Mother contends that the trial court improperly terminated her parental rights to Children, under subsection 2511(b), where DHS did not present clear and convincing evidence that termination would best serve Children's needs and welfare. Specifically, Mother asserts that termination was improper where she and Children shared a healthy bond that served as a "protective factor in their emotional wellbeing[,]" Mother's Brief at 18, severing that bond would be detrimental to Children, V.U. and B.U. clearly expressed their desire to return to Mother, and W.U. expressed a desire to maintain ongoing contact with Mother.

Recently, in *In the Int. of K.T.*, 296 A.3d 1085 (Pa. 2023), our Supreme Court clarified the standard that courts should employ when examining the parent-child bond under subsection 2511(b), stating:

> Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent. *See* [*In re Adoption of*] *C.M.*, 255 A.3d [343,] 358 [(Pa. 2021)] ("A parent's right to make decisions concerning the care, custody, and control of his or her children is among the oldest of fundamental rights. [However, t]he time-tested law of the Commonwealth requires that we balance this intrinsic parental interest within the context of a child's essential needs for a parent's care, protection, and support."); *In re H.S.W.C.-B*, [] 836 A.2d 908, 911 (Pa. 2003)

- 11 -

(In termination proceedings and appeals, "the best interest of the children is always paramount[.]"). *Cf. In re R.I.S.*, [] 36 A.3d 567, 579 (Pa. 2011) (plurality opinion) (Baer, J., concurring) ("It is incumbent upon the judicial system to be child-focused. Regardless of the heartbreak to a parent, children are entitled to every opportunity for a successful life, and a permanent, loving parental relationship greatly fosters that opportunity.").

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. *See In re Adoption of L.A.K.*, 265 A.3d 580, 593 (Pa. 2021). We have observed "the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." *In re T.S.M.*, 71 A.3d [251,] 268-69 [(Pa. 2013)]. Thus, the court must determine each child's specific needs. *See, e.g.*, *In re Adoption of S.P.*, [] 47 A.3d 817, 831 (Pa. 2012) (affirming trial court's conclusion termination "best serve[d]" child's needs and welfare where father would likely not be able to provide for her, especially considering her special needs and developmental delays, child did not have a relationship with father, and child had strong bond with half-sister placed in same foster family).

Moreover, the child's "emotional needs" and "welfare" include "intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider "whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268; *see e.g.*, *In re D.C.D.*, [] 105 A.3d 662, 677 (Pa. 2014) (trial court properly considered child's "strong bond with her foster family with whom she has lived nearly all her life and who has indicated a desire to adopt her" pursuant to [s]ection 2511(b)). And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which "is not always an easy task." *T.S.M.*, 71 A.3d at 267.

*       *       *

Accordingly, notwithstanding *T.S.M.*'s language directing "utmost attention" to the parental bond, a fuller review of relevant case law indicates that **bond, plus permanency, stability**[,**] **and all "intangible" factors may contribute equally to the determination of a child's specific developmental, physical,**

**and emotional needs and welfare, and thus are all of "primary" importance in the [s]ection 2511(b) analysis**. Judge Bowes, writing for the panel in [*In re*] *N.A.M.*, observed that, although the parental bond is a "major aspect" of the [s]ection 2511(b) analysis, "it is nonetheless only one of many factors to be considered by the court," in addition to the intangibles "such as love, comfort, security, and stability." 33 A.3d [95,] 103 [(Pa. Super. 2011)]. Moreover, the court must consider whether, in the context of all these factors, the parental bond is "necessary and beneficial" to the child. *See id.* (courts "must examine the status of the bond to determine whether its termination would destroy existing, necessary and beneficial relationship") (quotation marks omitted). *See also Int. of M.E.*, [] 283 A.3d 820, 836-37 (Pa. Super. 2022) ([t]o [] extent [] bond [exists], [] trial court must examine whether termination of parental rights will destroy [] "necessary and beneficial relationship[.]"); *J.N.M.*, 177 A.3d at 944 ("When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a 'necessary and beneficial relationship'"); *P.A.B.*, 570 A.2d at 525-26 (courts must consider [] parental bond and determine "whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial"). It is only a necessary and beneficial bond, after all, that should be maintained when [s]ection 2511(b) mandates the child's needs and welfare are of "primary" importance. As the statute directs, courts must evaluate whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare. This evaluation involves considering the effect of severing a child's bond with her parent. *T.S.M.*, 71 A.3d 267, 269. Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present. By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or significant, irreparable harm. *See E.M.*, 620 A.2d at 484 ("a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences"); *see also, e.g., M.E.*, 283 A.3d at 837 ("To the extent there is a bond, the trial court must examine whether termination of parental rights will destroy a 'necessary and beneficial relationship,' thereby causing a child to suffer 'extreme emotional consequences.'"); *J.N.M.*, 177 A.3d at 944 ("When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will

destroy a necessary and beneficial relationship, thereby causing a child to suffer extreme emotional consequences[.]"). Moreover, by evaluating the impact of severance to determine if it will impose more than an adverse or detrimental impact, courts correctly refine their focus on the child's development and mental and emotional health rather than considering only the child's "feelings" or "affection" for the parent, which even badly abused and neglected children will retain. *See T.S.M.*, 71 A.3d at 267, quoting *K.K.R.-S.*, 958 A.2d at 535 ("[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent") (alteration in original); *see also K.T.*, 2022 Pa. Super. Unpub. LEXIS 1272, 2022 WL 1793083, at *7 (Murray, J., dissenting), quoting *K.K.R.-S.*, 958 A.2d at 535.

We are painfully aware of the heavy and irrevocable consequences of termination; we have described it as a "death penalty" in the dependency context. *C.M.*, 255 A.3d at 362. Although it is always a difficult and fraught process, we have nevertheless concluded that, under certain circumstances, termination of parental rights is intended "to prevent children from growing up in an indefinite state of limbo, without parents capable of caring for them, and at the same time unavailable for adoption by loving and willing foster families[.]" *In re H.S.W.C.-B*, [] 836 A.2d 908, 910-11 (Pa. 2003). It is for this reason courts must not only consider the child's bond with the biological parent, but also "examine the intangibles such as the love, comfort, security, and stability the child might have with the foster parent." *In re K.Z.S.*, [] 946 A.2d 753, 763 (Pa. Super. 2008) (emphasis added); *see also N.A.M.*, 33 A.3d at 103 (same); *A.S.*, 11 A.3d at 483 (same). It is why federal law sets a twenty-two-month permanency timeline and requires concurrent planning so that agencies can prepare to quickly place the child in an alternative, permanent home if reunification efforts fail. *See supra* [at] *n*[.]19-20; 42 U.S.C. §671(a)(15)(F) (concurrent planning provision); *id.* §675(5)(E)(ii) (permanency timeline); *see also id.* §675(5)(C) [(Adoption and Safe Families Act] requires participating states adopt "procedural safeguards" by holding a permanency hearing and determining a permanency plan at least every twelve months the child is in foster care).

*Id.* at 1105-12 (emphasis added; footnotes, some citations, and headnotes omitted).

While there is an undeniable parent-child bond between Mother and Children, the trial court was careful to employ a totality of the circumstances approach when performing its needs and welfare analysis under subsection 2511(b). In addition to recognizing the parental bond, the court properly focused on "intangibles such as love, comfort, security, and stability," took into account the bond that Children have with their kinship family, a pre-adoptive home, and prioritized "the safety and security of Children" over the damage that the parental bond may cause if it is left intact. *In re K.Z.S.*, *supra*; *In re Adoption of L.C.J.W.*, 311 A.3d 41, 52 (Pa. Super. 2024) (citation omitted); *T.S.M.*, 71 A.3d at 267 (courts correctly refine their focus on child's development and mental and emotional health rather than considering only child's "feelings" or "affection" for parent, which even badly abused and neglected children will retain).

Here, the trial judge emphasized the fact that Children are "all struggling with uncertainty about the future, fear, [and] anxiety." N.T. Goal Change/Termination Hearing, 1/18/24, at 117. Even though Children may have had positive interactions with Mother during their inconsistent visits, the Children's trauma therapists, as well as Aunt, acknowledged that Children exhibited behavioral and emotional setbacks when Mother failed to attend a visit. Moreover, Children's trauma therapists clearly testified that they would not recommend Mother participate in caregiver sessions, a prerequisite to reunification, until she had completed a drug and alcohol program and successfully been discharged from mental health treatment. At the time of

- 15 -

the termination hearings, Mother was found to have been minimally compliant with her permanency plan and minimally progressed toward alleviating the circumstances that led to Children's original placement—having not obtained suitable housing, completed a CEU drug and alcohol evaluation/assessment, successfully completed a substance abuse program, or completed an evaluation and assessment for the Behavioral Health Services Unit.

Vaye testified that Children wanted to live with Aunt if they could not be returned to Mother. *Id.*, 3/8/24, at 44-45. Vaye also testified that while the parties had discussed the possibility of permanent legal custodianship (PLC) as a permanency goal, because Aunt "said she does not want to do PLC," *id.* at 45, DHS pursued adoption as the better permanency goal. *Id.* at 69.[8] Vaye testified that while Children have a bond with Mother, that bond is not beneficial to their emotional or physical needs and welfare, that they need stability and security, and that Aunt meets their physical and emotional needs. *Id.* at 49-50. Finally, Vaye finally testified that Children would not suffer irreparable harm if Mother's parental rights were terminated. *Id.* at 50-53.

---

[8] However, Vaye also testified that if Aunt did agree to do PLC, he would "be fine with that [because] that was [his] recommendation." *Id. But see* Pennsylvania Dependency Benchbook, 3rd Edition (2019), at Ch.12.4 Permanent Legal Custodianship ("In the hierarchical scheme of permanency options, permanent legal custodianship is less desirable than reunification or adoption, but preferable to permanent relative placement and another planned permanent living arrangement (42 Pa.C.S.[A.] § 6351(f.1)(3)."). Notably, in a PLC arrangement, the court no longer has an oversight role following the permanent transfer of legal custody. *Id.*

Because the trial court's factual findings are supported by the record, we conclude that the court did not abuse its discretion in weighing the subsection 2511(b) bond considerations. *T.S.M.*, *supra*. In coming to this decision today, we are not numb to the fact that termination carries with it "heavy and irrevocable consequences." *K.T.*, *supra* at 111. However, we must also keep in mind "the ticking clock of childhood," *T.S.M.*, *supra* at 269, and the fact that Mother's bond with Children is not in their best interests. *Id.* at 1106. Thus, we are constrained to affirm. *Int. of M.E.*, 283 A.3d 820, 839 (Pa. Super. 2022).

Decrees affirmed.[9]

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/27/2024

---

[9] Because we affirm the termination decrees, the appeals from the goal-change orders are moot. *See Int. of A.M.*, 256 A.3d 1263, 1272-73 (Pa. Super. 2021) (finding issues regarding goal change moot in light of termination of parental rights); *see also In re D.K.W.*, 415 A.2d 69, 73 (Pa. 1980) (stating once parental rights are terminated, issues of custody and dependency under Juvenile Act are moot).